1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA,          :
                                   :
  v.                               :
                                   :   CASE NUMBER CR-4:14-141
EAN HUGGINS-McLEAN,                :
                                   :
     Defendant.                    :
_____

TRANSCRIPT OF <u>JACKSON v. DENNO</u> HEARING
BEFORE THE HONORABLE G. R. SMITH
United States Courthouse
125 Bull Street
Savannah, Georgia
December 22, 2014

TRANSCRIBED BY: Victoria L. Root, CCR
                United States Court Reporter
                Post Office Box 10552
                Savannah, Georgia  31412

*(PROCEEDINGS TRANSCRIBED FROM ELECTRONIC RECORDING)*

2

1                     A P P E A R A N C E S

2

3        FOR THE GOVERNMENT:

4                JOSEPH D. NEWMAN, Esquire
                 Assistant United States Attorney
5                Post Office Box 8970
                 Savannah, Georgia  31412
6                (912) 201-2511

7

8        FOR THE DEFENDANT:

9                THOMAS A. WITHERS, Esquire
                 Gillen, Withers & Lake, LLC
10               8 East Liberty Street
                 Savannah, Georgia 31401
11               (912) 447-8400

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

Page

I.      PROCEEDINGS. . . . . . . . . . . . . . . .      4


II.     GOVERNMENT'S EVIDENCE

        1. HERBERT EUGENE HARLEY, JR.
           Direct Examination by Mr. Newman . . . . .      5
           Cross-Examination by Mr. Withers . . . . .     24
           Examination by the Court . . . . . . . .     44


III.    CERTIFICATE OF REPORTER. . . . . . . . . . .     51

4

P R O C E E D I N G S

-oOo-

(Call to order at 9:42 a.m.)

1    COURT CLERK:   The Court calls the case of

*United States of America v. Ean Huggins-McLean*, Criminal Case
Number CR-4:14-141.

MR. NEWMAN:   The Government's ready to proceed with
the *Jackson-Denno* hearing, Your Honor.

MR. WITHERS:   The Defense is ready, Your Honor.

THE COURT:   All right.   Well, the defendant has
alleged, without supporting affidavit, that he was traumatized
as a result of his arrest, and we are directed -- even though
the local rules require an affidavit supporting such a factual
assertion, we are directed to proceed with a hearing.

How many witnesses will you be calling?

MR. NEWMAN:   Just Agent Harley, Your Honor.

THE COURT:   All right.   Call him.

(Witness sworn)

COURT CLERK:   Thank you, sir.   Please be seated.

State your name and your occupation for the record,
please.

THE WITNESS:   Yes, sir.   My name is Herbert Eugene
Harley, Jr., and I am employed by the Chatham County Sheriff's
Office, from there assigned to the Chatham-Savannah Counter
Narcotics Team, and from there assigned to the Federal Bureau

5

1    of Investigation Violent Crimes Task Force, Savannah office.

2                    HERBERT EUGENE HARLEY, JR.,

3    having been duly sworn, was examined and testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. NEWMAN:

6    Q.    All right.  And have you recently been promoted to a

7    higher ranked position at the counter narcotics team?

8    A.    Yes, sir.  I've been promoted to a supervisory position

9    within CNT.

10   Q.    And what is it you supervise, sir?

11   A.    A group of eight to ten individuals.  They refer to us as

12   Tactical Investigations Team.

13   Q.    Back when this case was going on, were you working out of

14   the FBI office?

15   A.    I was, yes, sir.

16   Q.    And were you what's called a task force officer?

17   A.    I was.

18   Q.    For the sake of the record, what is a task force officer?

19   A.    A task force officer is a local law enforcement officer

20   who goes through the -- much of the same process as any other

21   federal agency, in this case, the FBI; who goes through the

22   same background clearance, et cetera; eventually have to clear

23   through the FBI; are then sworn in by both the FBI as well as

24   the U.S. Marshal to have federal arrest powers.

25   Q.    All right.  Is it essentially a means to increase the

1   manpower available to the federal law enforcement force --

2   A.    That's correct.

3   Q.    -- forces in the community?

4   A.    Yes, sir.

5   Q.    Now, this is a confession voluntariness hearing.

6         Have you had any experience in testifying in these types

7   of hearings before?

8   A.    Yes, sir, I have.

9   Q.    And where has that been, sir?

10  A.    In the superior courts of Chatham County, Georgia.

11  Q.    And how many total years have you been a state or county

12  law enforcement officer?

13  A.    I have been here within Chatham County since 2002.

14  Q.    Now, who is an individual named Mark Redman?

15  A.    Mark Redman was an individual previously targeted in

16  another investigation that originated within CNT.  In that

17  investigation, Mr. Redman was ultimately arrested for marijuana

18  charges where it was found that he was going to and from

19  Savannah, Georgia, to California where he was obtaining the

20  marijuana and then shipping the marijuana he purchased in

21  California back to Savannah for the purpose of distributing the

22  marijuana throughout Chatham County.

23  Q.    Did Mr. Redman operate a place of business in Chatham

24  County?

25  A.    He did.  It was called Elev8ed -- it's spelled

7

1    E-l-e-v-8-e-d -- on Broughton Street.

2    Q.    And where would Mr. Redman have the marijuana mailed to by

3    the U.S. Mail?

4    A.    He would have it sent to his business on Broughton Street,

5    again, within the borders of Chatham County, Georgia.

6    Q.    Did -- the U.S. postal inspectors, Ms. Plumley and

7    Mr. Dorroh, did they have a large role in the investigation of

8    Mr. Redman?

9    A.    They did.   We partnered together to investigate the

10   operation as a whole.   Through their counterparts in

11   California, they were able to determine when packages were sent

12   from California to the address on Broughton Street and

13   ultimately able to gain some video footage of it, et cetera.

14   Q.    All right.   When Mr. Redman was confronted and arrested

15   and apprised of the evidence that you and the postal inspectors

16   had accumulated, did he make a decision not only to plead

17   guilty but also to cooperate and assist law enforcement?

18   A.    He did.   That's correct.

19   Q.    What sort of assistance did he offer you?

20   A.    Mr. Redman was asked to identify his main source of

21   marijuana supply.   In doing so, he identified one Mr. Ean

22   Huggins-McLean.   He then went on further to give more

23   particular information concerning Mr. Huggins-McLean as well as

24   their history together with one another involving their drug

25   organization.

1    Q.    Do you see Mr. Huggins-McLean in the courtroom?

2    A.    I do, yes, sir.

3            MR. NEWMAN:    All right.    May the record so reflect,

4    Your Honor?

5            THE COURT:    Yeah.

6    BY MR. NEWMAN:

7    Q.    And was there -- did Mr. Redman relay to you the extent

8    over time of his dealings with Mr. Huggins-McLean?

9    A.    He did, yes, sir.

10   Q.    And how long back did it extend?

11   A.    I believe -- offhand, because I don't have those notes

12   with me, I believe it goes back 3 years, approximately.

13   Q.    All right.    And did you and the other agents formulate a

14   plan in which you would try and utilize Mr. Redman to further

15   this investigation?

16   A.    Yes, sir, that's correct.    We did.

17   Q.    What was the plan?

18   A.    Over the course of a period of time, we recorded phone

19   calls to Mr. Ean Huggins-McLean through Mr. Redman, who

20   voluntarily agreed to make the phone calls knowing they were

21   being recorded.

22        Throughout the series of phone calls, Mr. Redman discussed

23   future marijuana deals with Mr. Huggins-McLean ultimately to a

24   point where Mr. Huggins-McLean agreed to take money that would

25   be deposited into his Bank of America checking account -- I

1  believe it was Bank of America -- for the purpose of obtaining

2  marijuana in California and then shipping the marijuana to

3  the Savannah, Georgia, area with the plan to then meet up with

4  Mr. Redman a few days following that shipment in Savannah,

5  Georgia.

6  Q.    And did this come about in the spring of this year, 2014,

7  March, April, sir?

8  A.    Yes, sir, that's correct.

9  Q.    And what were the final aspects of the operation before

10  Mr. Huggins-McLean was to come to Savannah?

11  A.    Mr. Huggins-McLean was -- after we sent money to Mr. -- to

12  his account -- that money was official government funds that

13  was conducted by us -- Mr. McLean, through Mr. Redman,

14  confirmed that he did, in fact, receive the money into his bank

15  account.

16      Additional phone calls followed, and Mr. McLean --

17  Huggins-McLean agreed to send the marijuana to him.  That was

18  then followed up a day or two later by Mr. Huggins-McLean

19  calling with a tracking number for the United States postal

20  package containing the marijuana.

21      That marijuana, on an expected date, was seized with the

22  assistance of United States postal inspectors here in Savannah,

23  Georgia.  A search of it produced approximately 4 pounds of

24  marijuana.

25  Q.    Now, what date was that, sir?

1  A.    That actual date was on April the 9th, 2014.

2  Q.    All right.  And as part of the arrangement that was had

3  with Mr. Huggins-McLean, was he then coming to Savannah?

4  A.    That's correct.  Mr. Huggins-McLean had agreed to come to

5  Savannah to meet with Mr. Redman, one, to obtain his cut of the

6  marijuana that was sent ahead of time as well as to discuss

7  future marijuana transactions as they were trying to come up

8  with a formula to keep this as an ongoing operation where

9  Mr. Huggins-McLean could simply send the marijuana from

10  California, Mr. Redman distribute here in Savannah, and simply

11  get the money back via wire transfers.

12  Q.    How did Mr. Huggins-McLean travel to Savannah?

13  A.    By a airline.  I believe, offhand, it was Delta.

14  Q.    And what time did his flight arrive at the Savannah

15  International Airport?

16  A.    I do not have the exact time with me today, sir, but it

17  would have --

18  Q.    Approximately what time of day was it?

19  A.    -- been approximately sometime between 11:00 p.m. to

20  11:30 p.m., somewhere in that time.

21  Q.    All right.  And what plan did you and the other law

22  enforcement officers have by which you would be meeting

23  Mr. Huggins-McLean?

24  A.    Myself and several other agents, all who were in plain

25  clothing, with one uniformed airport police officer, we were to

1    go past the normal security checkpoint area to meet

2    Mr. Huggins-McLean as he got off the airplane, what I refer to,

3    maybe, as the concourse area.

4         The plan -- and as it played out -- was when Mr. McLean

5    got off the plane, one of the agents simply walked up to him,

6    identified their credentials, which shows FBI, et cetera,

7    identified himself, and asked him to step to the side.

8         Mr. Huggins-McLean did so.  He wasn't combative or

9    anything like that.  Once he was to the side, I again told --

10   I told him who I was, introduced myself, you know, with the

11   FBI.  I told him we needed to talk to him about his being in

12   Savannah, Georgia, and that, to not cause a scene, we're going

13   to wait off to the side and let all the crowd disperse off the

14   plane.

15   Q.   And when you speak -- when you use the word "crowd," are

16   you referring to other passengers on that flight?

17   A.   That's correct, yes, sir.

18   Q.   Did Mr. -- was Mr. Huggins-McLean traveling with any

19   luggage?

20   A.   Only a -- I believe, a carry-on, like a book bag he had on

21   his person.

22   Q.   All right.  Now, when you and the other agents met

23   Mr. Huggins-McLean as he deboarded this plane, were you -- had

24   you drawn or any of the other officers drawn their weapons?

25   A.   No, sir, absolutely not.  And if I recall correctly -- I

1  know I myself had my weapon concealed, and I believe all the

2  other FBI agents had their weapons concealed.

3  Q.    And after the other passengers on the plane had passed

4  where you, the agents, and Mr. Huggins-McLean were situated,

5  where did you take Mr. Huggins-McLean?

6  A.    We then walked up to the front part of the airport on

7  the -- I believe it was the upper level -- to a conference

8  room that was provided to us by the uniformed airport police

9  officer.

10 Q.    How did you manage that movement of Mr. Huggins-McLean?

11 A.    We simply just told Mr. McLean that he needed to walk with

12 us.  As I recall, he was never placed even in handcuffs at this

13 point.  He simply just walked with us.  With the exception of

14 one or two people kind of walking, again, next to him, there --

15 you know, there's no one even escorting him via arm techniques

16 or anything, simply just a casual walking.

17 Q.    All right.  Was it -- had you and the other officers and

18 the airport police discussed the use of a particular room at

19 the airport to interview Mr. Huggins-McLean?

20 A.    We simply advised the uniformed officer that we needed a

21 room to conduct an interview.  That's when he then escorted us

22 to that front part of the -- to the airport and placed us in

23 what I would deem to be a conference room.  And I believe he

24 even identified it as a conference room.

25 Q.    Give the Court some idea of the size of this conference

1    room.

2    A.    Sure.  The room itself was much like Your Honor's

3    courtroom here today, about the same size just about, maybe

4    just a little bit smaller in length but, for the most part, the

5    same size, same width.  It had one large table in the middle

6    with multiple chairs around it, again, to give the appearance

7    of a conference room, one door you entered.  And the walling

8    on this side to the right as you're sitting by the table was a

9    glass area that looked back out to the concourse area but had

10   blinds that were shut.

11   Q.    All right.  How many law enforcement officers accompanied

12   Mr. McLean in- -- Huggins-McLean into that conference room?

13   A.    Only a total of three people went into the room.  That was

14   Mr. Huggins-McLean, myself, and Special Agent Adam Rogalski.

15   We were the only three people who entered the room.  The other

16   persons stayed outside sitting in chairs.  And, again, that

17   would not have been visual to Mr. McLean because the curtain

18   area was closed.

19   Q.    And Mr. Rogalski is an FBI special agent; is that correct?

20   A.    That's correct.

21   Q.    Now, what took place in the conference room?

22   A.    I gave kind of a -- just -- I just made some general

23   conversation with Mr. McLean.  He made a statement that he was

24   hungry.  I think he even showed me a receipt from some type of

25   cinnamon bun place or something, said that's the only thing he

1  had eaten all day.  I told him if we had an opportunity, we'd

2  get him something to eat kind of deal.

3      He -- I think I explained to him that I wanted to talk to

4  him about why he was here in Savannah, Georgia, et cetera.

5      At some point, he made a comment that a friend of his

6  would be outside the airport waiting on him.

7      I said, "We'll try to see if we can get someone to try and

8  make contact with them."

9      Again, that friend, I believe he thought, was Mr. Mark

10  Redman.

11      I then explained to him we needed to talk to him, and he

12  wanted to know if he'd go to jail at that point.

13      I said, you know, at this point, I wasn't sure.  I said,

14  before we got to talking too much, I needed to advise him of

15  his rights.

16  Q.   How did you go about doing that?

17  A.   I had a standard FBI Miranda rights warning form, or

18  advice of rights, what's referred to in the FBI as a FD-395

19  form.

20          MR. NEWMAN:   Your Honor, may I approach the witness a

21  second?

22          THE COURT:   Yes.

23  BY MR. NEWMAN:

24  Q.   (Unintelligible) has a photograph --

25  A.   Sure.

1  BY MR. NEWMAN:

2  Q.    -- of a court tag on the bottom right.

3        Do you recognize that?

4  A.    Yes, sir.  This is a copy of that form I'm talking about.

5  Q.    All right.  Is there an indication about what time that

6  form was executed?

7  A.    Yes, sir.  It has the time at 2347, which is military time

8  for 11:47 p.m.

9  Q.    All right.  And whose signature -- signatures appear on

10  that form?

11  A.    Sure.  Under the -- the signature marked signed, being the

12  person who would sign who's being advised of his or her rights,

13  is Mr. Ean Huggins-McLean.  Below that are witnesses, being

14  myself as well as Adam Rogalski, and then the time.

15        And as you can see on the time, there's about a 1-minute

16  time difference showing that approximately 1 minute's passed

17  since the time he was advised of the form, signed it, and then

18  when we signed it.

19  Q.    What rights are contained on that form?

20  A.    I can read it verbatim --

21  Q.    Yes.

22  A.    -- if you'd like.

23  Q.    Please do.

24  A.    Again, the very top of the form says "Federal Bureau of

25  Investigation Advice of Rights."  Has your location, date,

1    time.  It goes into your rights.

2         It says, Before we ask you any questions, you must

3    understand your rights.

4         You have the right to remain silent.  Anything you say can

5    and will be used against you in court.

6         You have the right to talk to a lawyer for advice before

7    we ask you any questions.

8         You have the right to have a lawyer with you during

9    questioning.  If you cannot afford a lawyer, one will be

10   appointed for you before any questioning if you wish.

11        If you decide to answer questions now without a lawyer

12   present, you have the right to stop answering at any time.

13        And then, below that, it says the word "consent" in bold

14   lettering, and then it says, I have read the statement of my

15   rights, and I understand what my rights are.  At this time, I'm

16   willing to answer questions without a lawyer present.

17        And that's below where he signed his -- and then, as an

18   added -- what I do -- in most of my cases, I then ask them

19   to advise what their level of education is.  And I do that

20   personally to show that -- so I know, in my opinion, this

21   person is of mind -- mind (unintelligible) -- in terms of

22   education, understand truly what's going on.

23        And Mr. Huggins-McLean advised that he had 17 years of

24   education.  And that's -- would be my handwriting where I wrote

25   "17 years of education."

1   Q.   Right.  How did you advise Mr. Huggins-McLean of those

2   rights contained on that form?

3   A.   I simply showed him the form that we're looking at today.

4   I read over -- the form to him word for word just like I did

5   here in court.  I presented it to him and gave him the ability

6   to read over it if he wanted to.  I don't recall if he did or

7   did not.  And then he signed the form.  After that is when I

8   asked him about his level of education.

9   Q.   All right.  Now, how would you describe the condition of

10   Mr. Huggins-McLean as to sobriety at that point in time, close

11   midnight on April 10?

12   A.   He clear -- he appeared to be very clear and alert.  I

13   mean, he understood very much who I was, what was going on.  At

14   some point in the rights, he had made a statement that either

15   he -- either his mother or father was an attorney.  And, again,

16   he made statements that he was hungry and showed a receipt

17   where he only had, like, a cinnamon bun or something to that

18   effect.

19        So, I mean, we were having a conversation that, in my

20   opinion, didn't suggest that he was not understanding what was

21   going on or any forms of -- way intoxicated or not

22   understanding the situation.

23   Q.   Have you worked on the street as a police officer making

24   traffic stops?

25   A.   Yes, sir.

1  Q.    Are you familiar with the indicators of someone who might

2  be under the influence of alcohol or some other drug that would

3  affect mental comprehension?

4  A.    Yes, sir.

5  Q.    In your opinion, did Mr. Huggins-McLean exhibit any of

6  those symptoms and characteristics of someone who might be so

7  impaired?

8  A.    Absolutely not.

9  Q.    How would you describe his condition as to knowing where

10 he was and understanding the solemnity and seriousness of being

11 in a room with two law enforcement officers?

12 A.    He very much understood what was going on, even so much

13 understand what's going on he would occasionally want to know

14 if we made contact with his friend because he was just

15 concerned if his friend knew not to be waiting on him for a

16 period of time at the airport because he knew he would be a

17 little while with us, et cetera.

18      He understood the severity of the situation, in my

19 opinion.  He's -- in my opinion, understood every aspect that

20 was going on.  He understood it very clearly.

21 Q.    Who took the role of being the lead questioner in that

22 interview?  Was it you or Agent Rogalski?

23 A.    It was me.  And then, at times, Agent Rogalski would

24 interject or ask a question.

25      And to give you a layout of the -- as we're sitting in the

1  room, if we were sitting at the table, I would be sitting like

2  I am now.  Agent Rogalski was sitting at the very end of the

3  table.

4  Q.   To your right?

5  A.   To my right.  And Mr. Ean Huggins-McLean was right here in

6  front of me.  So, basically, the last three seats of the

7  table -- all of this area of the table was open, and I believe

8  Mr. McLean's book bag was sitting on the table where he had

9  placed it.  I believe he had some cookies that he said he made.

10     And, at some point, I told him, "If you want to, you can

11  eat those cookies if you want to eat some cookies," because

12  they were his cookies he had brought.

13     He wasn't -- he didn't want the cookies or something.  I

14  don't recall.

15  Q.   All right.  Relay to the Court what Mr. Huggins-McLean

16  told you.

17  A.   Sir, Mr. Huggins-McLean stated that -- he agreed that he

18  did know Mr. Mark Redman.  He stated that he'd known him for

19  about a period of 3 years and, during that time, he had

20  conspired with Mr. Redman to distribute marijuana.

21     Specifically, in this case, Mr. Huggins-McLean stated

22  that -- he agreed that he did, in fact, receive the $1,500 into

23  his banking account, and he stated that although he did not

24  personally take the marijuana and put it in the bag -- or the

25  box and place it in the United States postal office, he stated

1    that he acted as a middle person who took the money to this

2    unknown person who did that action.

3         Mr. Huggins-McLean stated that he also kept changing his

4    phone number when calling back Mr. Redman.   After the money was

5    received, he kept calling from different cell phone numbers.

6    He said he did that because he was afraid that Mr. Redman's

7    phone may have been bugged and they were listening and then

8    made a statement, "Clearly, that was the case," or something to

9    that effect.

10         And so -- and then he also had some other items on him

11    such as a diamond.   He talked about how that diamond was

12    taken -- or how it's a diamond he gets out of this South

13    Africa- or Africa-type ordeal, how that comes about, how he

14    receives the diamonds, how they're cut, et cetera, and that he

15    had hoped to get Mr. Redman involved in that business as well.

16    Q.    Did the subject of gold or liquid gold come up?

17    A.    It did.   He had two vials in his carry-on bag, which was a

18    purple-in-colorish liquid, which Mr. Huggins-McLean stated

19    were -- was liquid gold that one could consume by ingesting and

20    then went on a little bit about how, I guess, this gold helps

21    your body's minerals or something heal the body and said that

22    his hope was -- because Mr. Redman now, at this time, owned a

23    dollar-type store where everything's a dollar, he hoped to

24    bring some of this -- those type of items into his store to

25    sell them and try to figure out a way to make that happen, and

1   so he brought a sample with him.

2   Q.   Going back to when Mr. Huggins-McLean related concerning

3   his marijuana dealings with Mark Redman, did he confirm to you

4   that -- the time frame, going backwards in time, as to how long

5   those dealings had gone on?

6   A.   Yes, sir, he did.  He was pretty detailed in that respect

7   and essentially corroborated everything that Mr. Redman had

8   told us previously and said that, over their 3-year

9   relationship, he would meet with Mr. Redman in the state of

10  California and would obtain the marijuana for Mr. Redman.

11       The only thing he said differently from Mr. Redman is

12  Mr. Huggins-McLean stated that he had never sent anything in

13  the U.S. Postal Service prior to this incident where Mr. Redman

14  stated they had done this in the past.  With the exception of

15  that, everything else was the same.

16       Mr. Huggins-McLean also stated that he currently is doing

17  the same for others who are unknown to me -- based off the

18  conversation, it was suggested those people lived in the

19  California area -- that he was currently out of money from

20  those people because they hadn't paid him back yet.

21  Q.   Okay.

22  A.   And that -- and when I asked Mr. Huggins-McLean how did he

23  come about even being in this business, et cetera, he simply

24  stated that he had -- used to partner with or be around people

25  who grew large amounts of marijuana, people knew that he knew

1　these people, and that they kind of came to him trying to meet

2　people who sold marijuana because he knew that he,

3　Mr. Huggins-McLean, could connect them to these people.

4　Q.　Had you asked him any substantive questions about his drug

5　activities with Redman prior to your going into the rights set

6　forth on that form?

7　A.　No, sir.　Everything regarding anything that I would deem

8　to be of evidentiary value was relayed following the rights

9　signature form.

10　Q.　And at any point during the time that Mr. Huggins was

11　relating these things -- these facts to you about his dealings

12　with Mr. Redman was he restrained in that chair?

13　A.　No, sir.　As I recall, the only time Mr. Huggins-McLean

14　ever had handcuffs on his person was when the, I believe,

15　Metro officer came to transport him, to the best of my -- I

16　don't recall ever putting handcuffs on him anytime ahead of

17　time, especially while he was being interviewed.

18　　　As a matter of fact, a few times when we stepped out of

19　the room to converse with other agents to see if there was

20　anything else I was forgetting to ask, et cetera, because I

21　thought it was important for us to go out to the agents instead

22　of bringing other agents in the room for -- in terms of, like,

23　an intimidation factor, Mr. Huggins-McLean would get up and

24　pray or do some type of -- what I would deem to be like yoga or

25　something.　And as we came back in the room, we'd ask him to

23

1    join us.   He would sit back down, and we would pick up again.

2    Q.    And at what point was Mr. Huggins-McLean told that he was

3    under arrest?

4    A.    Towards the very end of the interview, he was told he

5    would be placed under arrest and taken to the Chatham County

6    Jail.   And, again, I believe, after we did that, we stepped out

7    of the room, and I believe he again went and did some type of

8    yoga or some form of meditation until the actual transport

9    officer showed up and then, you know, by their policy, placed

10   him in handcuffs.

11            MR. NEWMAN:   Your Honor, we'd tender into evidence as

12   the -- Government's Exhibit 1 that advice of rights -- executed

13   advice of rights form.

14            And that's our showing for this proceeding,

15   Your Honor.

16            THE COURT:   The exhibit is admitted.

17            MR. NEWMAN:   Yes, sir.

18            MR. WITHERS:   Your Honor, we would ask that

19   Agent Harley's rough notes be produced pursuant to Rule 26.2

20   and under Rule 16 as well as a portion of the written record

21   containing the -- any statement of the defendant.

22            MR. NEWMAN:   Your Honor, we oppose that motion

23   because my understanding of case law is that there has to be

24   a threshold showing of relevancy and need before the agent's

25   rough notes become relevant to the proceedings.

1          There has to be some issue where there's a suggestion

2    of a conflict, conflict in the testimony between this officer

3    and what he might have said in an earlier proceeding or between

4    this officer's testimony and another officer's testimony, and

5    no such circumstance has come about at this point.

6               THE COURT:  Do you even have your rough notes with

7    you?

8               THE WITNESS:  No, sir, I do not.

9               THE COURT:  The request is denied.

10                        CROSS-EXAMINATION

11   BY MR. WITHERS:

12   Q.    Agent Harley, do you recall the airline that

13   Mr. Huggins-McLean came in on?

14   A.    Again, without having that paperwork in front of me, I

15   believe it's Delta, but I can't say for sure.

16   Q.    All right.  And do you recall the time that he arrived

17   here in Savannah?

18   A.    I believe it was sometime between 11:00 that night and

19   11:30, somewhere in there, I believe offhand.

20   Q.    So after 11:00 p.m., then, at the very latest then?

21   A.    I believe, yes, sir.

22   Q.    And did you or any other agent keep a time log that night?

23   A.    I don't believe so.  No, sir.

24   Q.    Other than what's reflected in your 302?

25   A.    Yes, sir.

1   Q.   And do you recall that he arrived coming in through

2   airline -- from Charlotte, I believe?  Does that seem right?

3   A.   I believe he had a connector flight somewhere.  That could

4   be it.

5   Q.   All right.  And we're talking about an investigation that

6   occurred -- that is, he arrived the late evening hours of

7   April 10, 2014; right?

8   A.   Yes, sir.

9   Q.   And your 302 is actually dated April 16 of 2014; is that

10  accurate?

11  A.   (No response).

12  Q.   I think it's the bottom right-hand corner.  It says

13  "Drafted."

14  A.   Yes, sir.

15  Q.   All right.  Does that comply with the FBI requirements

16  related to the transcription -- or the dictation of 302s?

17          MR. NEWMAN:  Objection, relevancy, Your Honor.

18          THE COURT:  I'll let him answer that.

19  A.   I don't -- you have to repeat that question.  I'm sorry.

20  BY MR. WITHERS:

21  Q.   Does -- that 6-day delay, that is not consistent with

22  the FBI requirements regarding the dictation of 302s after the

23  event, is it?

24  A.   I don't know the exact timeline for FBI policy.

25  Q.   And I believe that you said that you made the initial

1    contact with Ean at the gate in the concourse --

2    A.    Yes, sir, that's correct.

3    Q.    -- is that right?

4          Was he at the beginning of the folks deplaning, at the end

5    of those --

6    A.    He was somewhere towards the middle -- towards the end,

7    somewhere in --

8    Q.    Okay.

9    A.    -- there.

10   Q.    Was it you that approached him and told him to step aside?

11   A.    No, sir.  I believe it was Special Agent Brian Snyder, I

12   believe.  That was just because, the way we were kind of spread

13   out, I think, as he came off, he was -- Agent Snyder was

14   closest to him.

15   Q.    And it was my understanding that there were three agents

16   and then one uniformed airport -- member of the airport police?

17   A.    It may have been a total of five agents and then one

18   uniformed officer.

19   Q.    Okay.  Were all of the agents, then, the nonuniformed

20   officers, in plain clothes?

21   A.    With the exception of the uniformed officer, all the

22   agents were in uni- -- or in civilian-type attire, yes, sir.

23   Q.    Did -- were y'all wearing raid jackets or any jackets

24   that -- or clothing that identified you as police?

25   A.    No, sir.

1    Q.    When did you first speak with Ean?  Was it at the gate?

2    A.    Yes, sir.  Whenever -- again, I believe Agent Snyder

3    showed him over to where I was, and I introduced myself to him

4    then.  As I'm sure you're familiar with airports, in that area

5    back there, they have all kind of seats where people sit and

6    wait to be able to board a plane.  He was asked to have a seat,

7    and we waited for the crowd to disperse, the crowd being the

8    persons who were on the plane like himself --

9    Q.    Right.

10   A.    -- but no conversation in between.

11   Q.    And I trust that you identified yourself as an agent or

12   police or what have you for the purpose of -- I don't know --

13   telling him to sit to the side; is that --

14   A.    Yes, sir.

15   Q.    -- accurate?

16   A.    That's correct.

17   Q.    All right.  And were the other agents then standing or

18   sitting with y'all as y'all were waiting to the side for the

19   folks deplaning?

20   A.    In the general area, yes, sir.

21   Q.    All right.  And was it -- it was appearing, in other

22   words, that it was you, a uniformed officer, and several other

23   agents; correct?

24   A.    Yes, sir.

25   Q.    And the -- the conversation that you had with him at that

1    point in time was fairly limited; is that right?

2    A.    That's correct, yes, sir.

3    Q.    And you told him that y'all were going to go talk with him

4    at another location; right?

5    A.    That's correct.

6    Q.    And I trust that you had presented to him, at that point

7    in time, your identification; correct?

8    A.    Yes, sir.

9    Q.    And had identified the other folks that were with you as

10   either federal or local agents; is that right?

11   A.    Yes, sir, that's correct.

12   Q.    Were they -- the other four agents other than yourself,

13   were they all federal agents, or were they state and local

14   agents?

15   A.    They were all federal.  I was the only TFO there that

16   night.

17   Q.    Okay.  And they were all FBI agents then; is that --

18   A.    Yes, sir.

19   Q.    -- correct?

20         Did you identify those persons as FBI agents?

21   A.    I don't believe I individually introduced them to him.

22   I think I just simply said, "Hey, all these other guys here

23   standing around are FBI agents, you know, with me in this

24   setting," I said, "with the exception of the one guy in

25   uniform.  That's a uniformed airport police officer."

1    Q.    Okay.

2    A.    So something to that effect.

3    Q.    I understand.  And then after the folks from the plane had

4    proceeded down the concourse, y'all escorted Mr. Huggins-McLean

5    to the interview room; is that right?

6    A.    That's correct, yes, sir.

7    Q.    And so he's walking, then, at that point with yourself,

8    four agents, and the uniformed officer; correct?

9    A.    Yes, sir.

10              THE COURT:  Was he frisked at any point during this

11   period?

12              THE WITNESS:  There may have been a small pat-down

13   when he originally went off to the side just for a weapons

14   check, but I don't recall us ever doing a full search of him at

15   that point, no, sir.

16   BY MR. WITHERS:

17   Q.    You -- and you mentioned that he had a book bag or kind of

18   a carry-on bag.

19         Did you search that bag at that point in time?

20   A.    I believe we searched the bag once we got into the

21   conference room, and -- which he even gave us, I believe,

22   offhand, because (unintelligible) search it, "I've got some

23   cookies in there," et cetera, something to that effect.

24   Q.    All right.  Did you tell him, at the point in time that

25   y'all were at the gate, that he was not to use his cell phone?

1  A.    I don't recall ever making any such statement like that.

2  Q.    Did he ask you -- do you recall whether he asked you if

3  you could -- if he could use his cell phone?  Excuse me.

4  A.    The only thing I recall in that respect was he said

5  something about -- I don't know if it was call or go outside,

6  but he wanted to make contact with who -- he believed

7  Mark Redman to be outside to pick him up, and I told him that

8  we would take care of that.

9  Q.    Okay.  When you got to the room upstairs at the airport, I

10 think you said you and Agent Rogalski --

11 A.    Yes, sir.

12 Q.    -- were the --

13 A.    Adam Rogalski, yes, sir.

14 Q.    -- were the two agents who went inside the room?

15 A.    (No response).

16 Q.    Yes?

17 A.    Yes, that's correct.  And just to clarify, too, it is an

18 upstairs room.  But from where we were, we were already on the

19 upper level, so it was simply a straight walk for us.

20 Q.    Okay.  And you've described it as a conference room.

21       Did you make arrangements regarding recording anything

22 that occurred in that conference room?

23 A.    No, sir, I did not.

24 Q.    Does that -- that conference room does have video

25 surveillance, does it not?

1    A.    I can't -- I can't speak to it.  I don't know, sir.

2    Q.    Okay.  You don't know whether it -- there's constant video

3    surveillance in that conference room or not?

4    A.    No, sir, I do not know.

5    Q.    When you got to the room, did Mr. Huggins-McLean tell

6    you that he needed to plug in his phone because it was -- his

7    battery was dead?

8    A.    I do, I believe, recall him saying that because I believe

9    he then was granted permission to plug it in because, as we

10   walked into the conference room -- and the table is immediately

11   kind of off to the right a little bit -- he went to an outlet

12   right to the left of the doorway and plugged in his phone.

13   Q.    Okay.

14   A.    He said it was dead or about to die or something.

15   Q.    Okay.  And you mentioned earlier that Mr. Huggins-McLean

16   had informed you that either his mother or father was an

17   attorney; correct?

18   A.    Correct.

19   Q.    And at a certain point in time, he told you that he wanted

20   to call his mother, did he not?

21   A.    At some point, he might have said that he wanted to call

22   his mother to let her know that we were talking to him or

23   something like that.

24   Q.    All right.  And he was not permitted to call his mother,

25   was he?

1    A.    He was not, no, sir.

2    Q.    All right.  In other words, when his phone had been

3    plugged in and the battery recharged, he wanted, at that point

4    in time, to call his mother; correct?

5    A.    No, sir.  This was initially, the very (unintelligible)

6    when we first got to the room or something.

7          He -- at some point there, he said that -- "Well, can I

8    call at least my mom and let her know I'm here and I made it

9    here?"

10         And I said, "Well, we'll do that later on.  We don't need

11   to do that right now."

12   Q.    Uh-huh.

13   A.    And then the statement regarding -- about his -- his

14   mother or father, whoever it was, being an attorney came at

15   some point, I want to say, a few minutes later when advising

16   him of his rights.

17         He made a comment, something like, "Oh, my" -- who --

18   whichever parent is an attorney and, "I don't know if I should

19   do this," or something like that, and then he went ahead and

20   agreed to speak.

21   Q.    Uh-huh.

22   A.    It was two separate statements.

23   Q.    Two separate -- just let me break that down because I'm

24   not sure I followed you.

25         The two separate statements were what?

1    A.    Well, I'm sorry.  I should say incidents, where you're

2    saying -- when he wanted to call his mom and then the charging

3    of the phone.

4    Q.    Okay.  All right.  So let me see if I got this right.  I'm

5    sorry.  I'm not really following you.

6          But, at some point in time, he told you he wanted to

7    charge his phone; correct?

8    A.    Correct.  That's when we first got into the conference

9    room.

10   Q.    And you allowed him to do so; correct?

11   A.    Correct.  At some point there, we said, "Okay.  Go ahead

12   and charge your phone."

13   Q.    All right.  And it's -- at or near that point in time, he

14   told you that he wanted to call his mother; correct?

15   A.    Correct.

16   Q.    And, as well, at or near that point in time, he told you

17   that his mother was an -- mother or father was an attorney;

18   correct?

19   A.    Correct.

20   Q.    And you told him that he could not use his phone; correct?

21   A.    Correct.

22   Q.    By the way, did --

23              THE COURT:  This is before you administered rights to

24   him?

25              THE WITNESS:  The statement that he wanted to call

1    his mother was before the rights statement.  And at some point

2    prior to his signature on the rights, he made a statement that

3    one of his parents was an attorney.

4            THE COURT:  Is this after he has been talking to you?

5            THE WITNESS:  No, sir, not in terms of the question

6    regarding -- like evidence purpose questions.  This is when I

7    present the rights when I'm talking to him.

8            And he made some statement about -- I believe it's

9    his mother -- "My mom's an attorney.  I don't" -- and then said

10   something to the effect, "I don't know if I should do this," or

11   something like that.

12           THE COURT:  In other words, before he signed, he

13   indicated his mother was an attorney; he was unsure whether he

14   should sign or not?

15           THE WITNESS:  Correct.

16           THE COURT:  Did he ask to place a call at that point

17   to his mother?

18           THE WITNESS:  Not that I recall, no, Your Honor.

19           THE COURT:  Proceed.

20   BY MR. WITHERS:

21   Q.    And, Agent, you've got your 302 in front of you there, do

22   you not?

23   A.    Yes, sir.

24           MR. WITHERS:  And it's attached, for purpose of the

25   record, to the motion.

1    BY MR. WITHERS:

2    Q.    That 302, by the way, does not reflect anything with

3    respect to Mr. Huggins-McLean requesting to use his phone, does

4    it?

5    A.    No, sir.

6    Q.    It does not reflect that Mr. Huggins-McLean told you that

7    his mother was an attorney, does it?

8    A.    No, sir.

9    Q.    Or that Mr. Huggins-McLean wanted to call his mother, does

10   it?

11   A.    No, sir.

12   Q.    Would that information be reflected in your rough notes?

13   A.    I don't believe so.

14   Q.    Now, your 302 says that the rights waiver was signed at

15   11:30 p.m.; correct?

16   A.    Yes, sir.

17   Q.    And the rights waiver, though, actually was signed by

18   Mr. Huggins-McLean at 2346; correct?

19   A.    Yes, sir.

20   Q.    And you signed it at 2347 or --

21   A.    Yes, sir.

22   Q.    -- 11:47; correct?

23         During the intervening time that is reflected in your 302

24   at 11:30 p.m., was there any interview of Mr. Huggins-McLean

25   between that time of -- reflected as 11:30 p.m. and the time of

1    the signing of the rights waiver at 11:46 p.m.?

2    A.    No, sir, not that I can recall.

3    Q.    Do you recall what the passage of time was between the

4    time you met Ean at the gate and the time that he was

5    interviewed in the conference room that you've described?

6    A.    If I had to guess, maybe approximately 15 minutes.

7    Q.    And I apologize if I asked you this question,

8    Agent Harley, but did you tell me that you had the ability to

9    audio record the statement at the time it was made?

10    A.    You asked if the conference room had the ability, and I

11    cannot speak to its ability.  I do not know the answer to that

12    question.

13    Q.    Did you have the ability to audio record?

14    A.    I didn't have a recorder with me.  No, sir.

15    Q.    Did you -- in answering Counsel's questions, you had

16    talked about the plan for the takedown of Mr. Huggins-McLean

17    and meeting with Mr. Huggins-McLean.

18          Did you make a conscious decision to not record that

19    conversation?

20    A.    Yes, sir.

21    Q.    And why was that?

22    A.    Because my normal operating procedures -- the interviews

23    were not recorded at that time by the FBI as they are now

24    following the DOJ.

25    Q.    When you got to the interview room, you described the

1    setting at the table.

2        Was your weapon displayed at the time that y'all were in

3    the interview room?

4    A.   No, sir.  Again, as best I recall, my weapon was concealed

5    the entire time.

6    Q.   And where was it concealed?

7    A.   On my left side with my shirt over it, shirt or jacket,

8    whatever I had on.

9    Q.   And what about with respect to Agent Rogalski, if I'm

10   pronouncing that right?

11   A.   Again, I believe his was concealed the whole time.

12   Q.   And the three agents that were standing outside, were they

13   armed?

14   A.   I'm assuming they were, yes, sir.

15   Q.   And were their weapons concealed or in plain view?

16   A.   I never saw any of their weapons displayed.

17   Q.   When -- back to Mr. Huggins-McLean's phone, when the phone

18   was -- when the battery was sufficiently charged, did anyone --

19   either you or Agent Rogalski search through his phone?

20   A.   I did not.  I don't recall Agent Rogalski doing it.  I

21   can't speak 100 percent on it.  That's the best I can recall.

22   Q.   Did -- were you the one who was taking notes during the

23   interview, or were you the one doing the questioning during the

24   interview?

25   A.   Both, questioning and taking notes.

38

1    Q.    You were doing both?

2    A.    Correct, yes, sir.

3    Q.    What about Agent Rogalski?  Did he take notes during the

4    interview?

5    A.    I don't recall him taking notes, to the best of my

6    ability.

7    Q.    And you don't recall whether he searched

8    Mr. Huggins-McLean's phone?

9    A.    I do not recall, no, sir.

10   Q.    During the -- when you got to the room, do you recall

11   searching Mr. Huggins-McLean's book bag?

12   A.    Yes.

13   Q.    And did you ask for his consent to search his book bag?

14   A.    Yes, sir, we did.

15   Q.    That consent is not reflected in your 302, is it?

16   A.    No, sir.

17   Q.    In fact, there's nothing in your 302 regarding that book

18   bag, is there?

19   A.    No, sir.

20   Q.    And you did not get a written waiver with respect to the

21   search of his book bag, did you?

22   A.    No, we did not.

23   Q.    And --

24             THE COURT:  Did he give you consent to search that?

25             THE WITNESS:  Yes, sir.

39

BY MR. WITHERS:

1

2  Q.    Did that search of his book bag take place before you
3  began the questioning?

4  A.    I believe it did.

5  Q.    And when you searched his book bag or his backpack, you
6  actually physically put the items of that book bag out on the
7  table, did you not?

8  A.    We did, yes, sir.

9  Q.    And you were the one that actually searched the book bag,
10 did you not?

11 A.    Correct.   Yes, sir.

12 Q.    Now, you mentioned as well that Mr. Huggins-McLean asked
13 you if he was going to go to jail.

14      That inquiry from him took place when y'all first went
15 into the conference room, did it not?

16 A.    It did.   And if I can clarify something before we go
17 further, I believe the search of the bag, thinking back on it,
18 came after the rights because, when talking to him after the
19 rights about the diamond and gold aspect of it, he said that he
20 actually had a diamond with him, which I didn't realize at the
21 time.

22      And it was, I believe, in his wallet, which was on his
23 person, so he voluntarily produced that diamond.   It was, like,
24 in a little tight -- wax paper bag kind of deal.

25      And then, from there, he made a statement that he had the

40

1 gold in his bag, the liquid gold.

2   And that's when I said, "Well, do you mind if we search

3 through your bag and make sure there's nothing else in there?"

4   He said, "Yeah.  Go ahead."

5   And that's -- like I stated earlier, he had some cookies

6 and all in there, et cetera.  So it was sometime following --

7 shortly after the rights -- Miranda'ing and him signing,

8 because the first thing we started talking about was his

9 diamond and stuff before we got into the other.

10 Q. Okay.  And just so I understand -- and I apologize.  So

11 the search of his book bag took place before or after the

12 signing of the rights waiver?

13 A. I'm pretty sure it was after the rights waiver.

14 Q. Okay.  And then -- but we were just talking,

15 Agent Harley -- when y'all first got into the conference room,

16 you said that Ean asked about whether he was going to go to

17 jail or not?

18 A. Yes, sir.

19 Q. And he was concerned, was he not, about the implication of

20 talking to you?  Fair to say?

21 A. He made some form of statement that he didn't want to

22 talk if he was going to go to jail or something to that -- a

23 statement like that.

24 Q. All right.  And you -- fair to say that you told him that

25 things would go better for him if he spoke with you?

1   A.     That's correct, something to that effect.

2   Q.     All right.  And with respect to his reluctance to speak to

3   you, you didn't -- that's not reflected in your 302 either, is

4   it?

5   A.     No, sir.

6   Q.     And with respect to his reluctance to speak to you, one of

7   the things that Ean wanted to know, as a practical matter, is,

8   if he spoke to you, whether he would be able to leave at the

9   end of that interview; true?

10  A.     Yes, sir, that's correct.

11  Q.     And you assured him that -- if he spoke with you, that he

12  could leave at the end of that interview?

13  A.     No, sir.  That's incorrect.

14  Q.     And you started off the interview, did you not, talking

15  about the issue of the diamonds and the gold from Africa; is

16  that right?

17  A.     That's correct, yes, sir.  And to clarify that, when I

18  asked him -- starting the interview after the rights signing,

19  I asked him why he was here, and he said that he was involved

20  in a diamond and gold thing and he had a partner here that he

21  thought he wanted to bring into it.

22         And that's when he said he had a diamond on him or -- and,

23  again, I'm summarizing, of course -- and he had the other stuff

24  in the bag.

25         And once we discovered the liquid gold, that's when he

1   started saying about how the person he thought he was meeting

2   had a dollar store; he was going to try this; et cetera.  So

3   that's how the interview began.

4   Q.    I see.  And with respect to that, the FBI -- or Redman

5   had actually purchased Ean's ticket to come to Savannah; is

6   that accurate?

7   A.    That's accurate, yes, sir.

8   Q.    As well as, I think you said, put money into one of his

9   accounts; correct?

10  A.    Correct.

11  Q.    And did you say that amount was $1,500?

12  A.    I believe it was 1,500 offhand, yes, sir.

13  Q.    Okay.  And the purpose of that -- placing that money into

14  his bank account was for him to pay bills; is that correct?

15  A.    No, sir.  That's not correct.  The purpose of that was --

16  for our purpose, was for him to send us marijuana.  I believe,

17  in some point of the recordings, one time, Ean said that if

18  Mr. Redman could go ahead and send him the money, then he

19  would go ahead and pay some bills he had to pay with

20  (unintelligible), go ahead and then go pay -- buy the weed with

21  the other or something to that respect.

22      But our purpose was we were sending the money for

23  marijuana, for him to essentially front us marijuana which he

24  would send to us via United States postal mail.

25  Q.    Do you know, Agent Harley, what the duration of the

1  interview was, the -- your 302 is only a page and a half.  I'm

2  wondering if that reflects that it wasn't a very long interview

3  or what the duration is.

4  A.    I couldn't give you an exact time.  I'm sure, through

5  research, I could go back and find you a better time based on

6  when we called for transport, but I don't have that.

7  Q.    As you sit here today, do you recall whether it was

8  15 minutes, an hour, hour and a half?

9  A.    If I had to guess, anywhere from 30 minutes to an hour,

10  somewhere in there, total.

11  Q.    And I think you had told Mr. Newman that, at certain times

12  during the interview, you would step outside and then come back

13  inside?

14  A.    That's correct, yes, sir.

15  Q.    And that -- while you were outside, that Ean would be

16  meditating, doing yoga, what have you?

17  A.    That's correct.

18  Q.    Were you able to determine that because of video

19  surveillance or from walking in and seeing him actually doing

20  that?

21  A.    No, sir.  As I testified earlier, whenever we'd walk out

22  of the room -- the blinds were ones that you could kind of pull

23  up and down, which kind of turned the blinds.  So we'd, before

24  we'd leave the room, turn them so we could have a little bit of

25  visual.

44

1    Q.    I understand.

2    A.    And from the outside looking in, you could see him doing

3    those movements.

4    Q.    And at the conclusion -- and that occurred on a few

5    occasions when y'all would walk out, collaborate, walk back in?

6    A.    I believe it was a matter of two times total or something.

7    Q.    And at the conclusion of the interview, Mr. Huggins-McLean

8    was arrested; correct?

9    A.    That's correct, sir.

10                   MR. WITHERS:   Thank you.

11                   I don't have any further questions, Your Honor.

12                   MR. NEWMAN:   No redirect, Your Honor.

13                              EXAMINATION

14   BY THE COURT:

15   Q.    You testified that he said to you -- at some point, he

16   expressed a desire not to talk if he was going to jail?

17   A.    Your Honor, he made the statement that if he talked, would

18   he go to jail, something to that effect.   And I said that, at

19   that point, I wasn't sure what was going to happen to him, that

20   I had hoped to talk to him to have a better understanding of

21   what his true role was.

22   Q.    And Counsel just asked you about a statement that you made

23   to him.   In essence, you said here things were going to go

24   better for him -- I think maybe you concurred with Counsel's

25   statement -- if he did speak with you.

45

1      What precisely did you say regarding some promise of

2  benefit or favorable treatment if he agreed to speak?

3  A.   As I recall, I was simply trying to tell him that I knew

4  a lot more than probably what he thought I knew and that, you

5  know, if he was going to -- it would be better for him to speak

6  and --

7  Q.   This is before or after the advice of rights and the

8  waiver?

9  A.   I believe this was before.

10  Q.   And you said?

11  A.   Simply the fact that it's a fairly in-depth investigation

12  and that I probably knew more than what he probably thought I

13  did and that, in my opinion, it would be better for him to be

14  truthful and honest and to speak to us than not.  But it was,

15  you know, obviously his choice.

16  Q.   Did you promise him any favorable treatment if he would

17  speak?

18  A.   Absolutely not.  No, Your Honor.

19  Q.   Questions were asked about his reference to his mother

20  being an attorney.

21      And if I understood your response a moment ago, his

22  initial request when the issue about his phone -- of losing

23  power -- he said he wanted to call his mother?

24  A.   That's correct.

25  Q.   He didn't, at that point, say she was an attorney?

1    A.    No, sir.

2    Q.    Did you -- what response did you give when he indicated

3    the desire to call his mother?

4    A.    If I recall correctly, he made the statement that he just

5    wanted to call his mother to let her know he had made it here

6    okay.   And I said that, you know, we'd hold off on doing that.

7    Q.    And at what point precisely did he make reference -- how

8    far along in the interview -- or how far in the process here

9    before he mentioned that his mother was an attorney?

10   A.    If I recall correctly, it was after I read him the rights

11   as listed in the exhibit here.   You know, he was considering

12   signing it.

13       At some point, he made a statement about -- again, I

14   believe he said his mother was an attorney and he was

15   wondering -- he -- so he said something to the effect of, "My

16   mom's an attorney.   I wonder if I should sign this or not," or

17   something to that effect.

18       And I simply assured him the decision was his, you know,

19   that he was an adult.   And if I recall correctly, the rights

20   advice form was, if I may show, simply pointed in a direction

21   towards him.   And shortly thereafter at some point is when he

22   signed it.

23   Q.    After he signed it, did he ever indicate that he wanted to

24   talk to an attorney, be it his mother or anyone else?

25   A.    Absolutely not.

1  Q.    Did he ever exercise his right to counsel?

2  A.    No, sir.

3         THE COURT:  All right.  You may go down.

4         THE WITNESS:  Thank you.

5         THE COURT:  Any other witnesses?

6         MR. NEWMAN:  No, Your Honor.  That's our showing.

7         THE COURT:  Any from the Defense?

8         MR. WITHERS:  No, Your Honor.

9         THE COURT:  The question raised by this motion is

10 the voluntariness of the statements.  There is no allegation in

11 the motion to suppress that there was a violation of Miranda

12 rights, that there was an invocation of those rights.

13        So the issue before the Court is voluntariness, and

14 voluntariness may have not meant one thing when -- in the case

15 law when *Jackson v. Denno* issued, but it means -- is later

16 defined by the Supreme Court to mean quite specifically the

17 absence of police coercion.

18        So an essential predicate to a finding of

19 involuntariness is some form of police coercion.  I think the

20 Supreme Court's exact quote is coercive police activity is a

21 necessary predicate to a finding that a confession is

22 involuntary.

23        Where is the police coercion here?

24        MR. WITHERS:  Your Honor, I think twofold: Number 1,

25 the issue with respect to Mr. Huggins-McLean attempting to call

1  his mother, who is his -- who is an attorney, and being told

2  that he could not do so and, Number 2, the statement to

3  Mr. Huggins-McLean that if he speaks that things will go well

4  for him.

5         And I would submit to you, Your Honor, that -- under

6  the totality of the circumstances, that that would indicate

7  coercive tactics.

8         THE COURT:  All right.  Anything from the Government?

9         MR. NEWMAN:  Your Honor, I think what you have here

10  is a somewhat unusual situation of a witness displaying far

11  more candor than the Court is generally bestowed upon at

12  proceedings of this type.

13         When Mr. Withers asked Agent Harley -- or actually --

14  excuse me -- when the Court asked Agent Harley the question

15  about did the -- did this certain conversation occur before or

16  after the signing and execution of the Miranda waiver and

17  Agent Harley said it was before, I think a calculating,

18  somewhat manipulative witness would have said after because, by

19  saying before, it didn't actually advance his side of the case,

20  but it was truthful.

21         And, Your Honor, in this case, while Mr. Withers

22  would like to have the facts bespeak an unequivocal assertion

23  of the right to attorney representation, that just isn't in

24  this fact pattern.

25         And by the same token, when Agent Harley testified

1    that things would go better if he spoke, I think that could be

2    interpreted a lot of different ways, not the least of which is

3    that it would be reported to the Prosecution, which would then

4    affect how your case would be handled.

5            And the fact is:  The Government didn't seek to

6    detain Mr. Huggins-McLean, did not perceive him as a threat to

7    the community until -- you know, of his various defalcations

8    with the structures of bond.  So -- and the Court can find

9    numerous instances of case law where such, kind of, ambiguous

10   or innocuous statements by a law enforcement officer have been

11   found not to overcome the will of a person in similar

12   circumstances not to speak.

13           The fact is:  Mr. Huggins-McLean, by his own

14   reckoning, has 17 years of education, which, I guess, is 1 year

15   beyond a 4-year college degree; was and is an intelligent and

16   articulate man able to make a decision.

17           And yes, it is a fairly, you know, shocking

18   circumstance that he found himself in in that he's in a small

19   room in an airport with five law enforcement officers who have

20   accompanied him to that room and he's in that room with two

21   law enforcement officers, but everything he said to the -- to

22   Agent Harley and FBI Agent Rogalski was a product of his free

23   will and voluntary.

24           THE COURT:  All right.  Well, there's lots of case

25   law about what agents can say at the time they're questioning

1    someone and the representations they can make.  What they

2    cannot do is promise some benefit: a lower sentence, the

3    charges will be dismissed, or they'll be charges of a lesser

4    nature if there is an agreement to talk.

5           But we will consider this and take the evidence

6    into consideration and issue a report and recommendation as to

7    whether his statement was voluntary.

8           THE MARSHAL:   All rise.

9                (Proceedings concluded at 10:44 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1                    C E R T I F I C A T E

2

3        I, Victoria L. Root, Certified Court Reporter, in and for

4    the United States District Court for the Southern District of

5    Georgia, do hereby certify that the foregoing transcript of the

6    proceedings held in the above-entitled matter was transcribed

7    to the best of my ability from the Court's electronic recording

8    system and that the transcript page format is in conformance

9    with the regulations of the Judicial Conference of the United

10   States.

11        WITNESS MY HAND AND SEAL this 26th day of December, 2014.

12

13

14

15

16

17

18

19                                    */s/ Victoria L. Root*
                                    VICTORIA L. ROOT, CCR B-1691
20                                   United States Court Reporter
                                    Southern District of Georgia
21                                   Savannah Division

22

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066