UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. CR414-141 |
| ) | |
| EAN HUGGINS-McLEAN, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Indicted on drug conspiracy charges, defendant Ean Huggins-McLean challenges the voluntariness of the statements he made while detained and questioned by federal agents. Doc. 29. The sole witness at the evidentiary hearing on defendant's motion, Chatham County Sheriff's Deputy Herbert Eugene Harley, Jr. (then serving as an FBI Task Force Officer), provided convincing testimony establishing that defendant made a knowing and voluntary waiver of his Fifth Amendment privilege against self-incrimination prior to his interrogation. Accordingly, defendant's motion must be **DENIED**.

**I. BACKGROUND**

In the Spring of 2014, federal task force agents arrested Mr. Mark

Redman on marijuana distribution charges. Suppression Hearing Transcript (hereinafter "Tr.") at 6-7. Redman, who agreed to plead guilty and cooperate with the agents, identified Ean Huggins-McLean as his main source of supply for marijuana that was being shipped through the mail from California to Redman's business in Savannah, Georgia. *Id.* at 7. Redman made consensually monitored phone calls to defendant and arranged to finance a new marijuana shipment by depositing funds (furnished by the government) into defendant's checking account. *Id.* at 8-9. After receiving the funds, defendant purchased the marijuana in California and mailed it to Redman. *Id.* at 9. Using the postal tracking number furnished by defendant, the agents intercepted the package, which was found to contain four pounds of marijuana. *Id.*

Defendant then made plans to fly to Savannah to obtain his cut of the marijuana and discuss with Redman future marijuana transactions. *Id.* at 10. Defendant landed at the Savannah International Airport on April 10, 2014, at around 11:00 to 11:30 p.m. *Id.* When he disembarked, he was met by three FBI agents and Task Force Officer ("TFO") Harley, who were all in plain clothing, and a uniformed airport police officer. *Id.*

One of the agents approached defendant, produced his FBI credentials, and asked defendant to step to the side. *Id.* at 11. TFO Harley introduced himself, stated that the agents needed to talk to him about his trip to Savannah, and explained that they would wait for the other deplaning passengers to disperse so as "to not cause a scene." *Id.* Defendant cooperated with this request and then walked with the agents to a conference room at the front of the airport.[1] The conference room was spacious, with a large table in the middle and multiple chairs around it. *Id.* at 13. Only defendant, TFO Harley, and FBI Special Agent Adam Rogalski entered the room and had a seat at the table. *Id.* (noting that the rest of agents remained outside the conference room, although that would not have been visible to defendant).

After "some general conversation," defendant stated that he was hungry, as he had only eaten a cinnamon bun all day. *Id.* at 13-14. Harley said that if the agents "had an opportunity," they would get him something to eat. *Id.* at 14. When defendant indicated that his phone

---

[1] TFO Harley testified that while defendant may have been subjected to a brief patdown for weapons, tr. at 29, he was not placed in handcuffs and no "arm techniques" were used to escort him to the front of the airport --"just casual walking." *Id.* at 12.

battery needed recharging, the agents allowed him to plug his phone into a nearby outlet. *Id.* at 31. Defendant then expressed concern about a person who was waiting to pick him up outside the airport. *Id.* The agents, believing that defendant was referring to Redman (who was not waiting outside as defendant assumed), indicated they would have someone try to make contact with him. *Id.* at 14, 30. When defendant asked if he could "at least [call] my mom and let her know . . . I made it here," Harley said "Well, we'll do that later on. We don't need to do that right now." *Id.* at 32.

TFO Harley then redirected the conversation to the issue of why defendant had come to Savannah, whereupon defendant asked whether he was going to jail. *Id.* at 14. Harley replied that he "wasn't sure," but that he needed to advise defendant of his rights before proceeding with an interview. *Id.* Harley read defendant his rights using a standard FBI advice-of-rights form. *Id.* at 15-17. Harley noted on the form that defendant had 17 years of education. *Id.* at 16. Harley testified that he found defendant "to be very clear and alert" and concluded that "he understood very much who I was, what was going on." *Id.* at 17.

Following the advice of rights, but before executing a waiver of his rights, defendant stated that either his mother or father was an attorney, *id.* at 17, and expressed some uncertainty about whether to speak with agents. *Id.* at 17, 32, 34. Harley assured defendant that "the decision was his." *Id.* at 46. Defendant signed the waiver form and agreed to submit to an interview at 11:47 p.m. At no point prior to or during the interview did defendant ever indicate that he wanted to consult with an attorney. *Id.* at 46-47.

At the outset of the interview defendant consented to a search of a book bag that he had carried off the airplane. *Id.* at 19, 38, 40. Inside the bag were some cookies which Harley invited defendant to eat if he wished. *Id.* at 19, 40. During the course of the 30 to 60 minute interview, TFO Harley and Agent Rogalski would sometimes leave the room and converse outside with other agents. On these occasions defendant would get up and begin to do yoga or some form of meditation. *Id.* at 22. Defendant gave a detailed account of his marijuana dealings with Redman. *Id.* at 19-21. At the conclusion of the interview, the agents informed defendant that he was under arrest. *Id.* at 23.

TFO Harley conceded on cross examination that when defendant expressed reservations about talking to the agents if he was going to jail, Harley indicated that "things would go better for him" if he cooperated, or words "to that effect." *Id.* at 40-41. Follow-up questioning by the Court led to the following exchange:

> Q. What precisely did you say regarding some promise of benefit or favorable treatment if he agreed to speak?
>
> A. As I recall, I was simply trying to tell him that I knew a lot more than probably what he thought I knew and that, you know, if he was going to -- it would be better for him to speak and --
>
> Q. This is before or after the advice-of-rights and the waiver?
>
> A. I believe this was before.
>
> Q. And you said?
>
> A. Simply the fact that it's a fairly in-depth investigation and that I probably knew more than what he probably thought I did and that, in my opinion, it would be better for him to be truthful and honest and to speak to us than not. But it was, you know, obviously his choice.
>
> Q. Did you promise him any favorable treatment if he would speak?
>
> A. Absolutely not. No, Your Honor.

*Id.* at 45.

## II. ANALYSIS

In his brief, defendant asserted that his "waiver of [*Miranda* rights] and statement made so soon after [the] traumatic event [of his arrest] can't be deemed to be *knowing* or voluntary." Doc. 29 at 5 (emphasis added). At the evidentiary hearing, however, defendant abandoned any claim based on *Miranda v. Arizona*, 384 U.S. 436 (1966), and conceded that he was challenging only the voluntariness of his confession. Tr. at 47 (defense counsel never disputed the Court's assertion that "the issue before the Court is voluntariness," *not* failure to provide or understand *Miranda* warnings).[2]

Defendant concedes that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When asked at the conclusion of the

---

[2] The record offers no support for a *Miranda* challenge in any event, for the uncontested testimony at the evidentiary hearing established that defendant was carefully advised of his *Miranda* rights and that he made a knowing and intelligent waiver of those rights. Defendant, who is well educated, was "clear and alert" at the time of his interview, tr. at 17, exhibited no symptoms of any mental impairment, "very much understood what was going on," *id.* at 18, and gave a detailed account of his criminal activities. It is undisputed, therefore, that (1) defendant was informed of his right to remain silent and consult with counsel (including appointed counsel) prior to any questioning, and of the consequences of the decision to abandon those rights; and (2) he understood that advice and nevertheless elected to speak with the agents. *Miranda*, 384 U.S. at 444, 479. That defendant made a "knowing and intelligent" waiver of his *Miranda* rights is beyond dispute.

evidentiary hearing to identify the police coercion in this case (which defendant had failed to do in any prior brief), defense counsel stated the following:

> Your Honor, I think twofold: Number 1, the issue with respect to Mr. Huggins-McLean attempting to call his mother, who is his -- who is an attorney, and being told that he could not do so and, Number 2, the statement to Mr. Huggins-McLean that if he speaks things will go well for him.

Tr. 47-48.[3] Neither of these arguments is persuasive.

The first contention -- that the agents' refusal to allow defendant to

---

[3] Nowhere in his motion did defendant assert that the agents coerced his confession by refusing to let him call his mother or by promising that things would go better for him if he cooperated. It is fair to assume that had either of these occurrences actually mattered to defendant, who certainly knew all the details of his interrogation, they would have been at least mentioned in his brief.

The only factual basis for suppression asserted in defendant's motion is that upon his arrival at the Savannah airport he was "whisked off to a small interrogation room where he was questioned by multiple agents." Doc. 29 at 4. But defendant was not "whisked off," for the agents simply approached him as he deplaned, displayed their credentials, and walked with him to the front of the airport in a "casual" manner. Tr. 11-12. Instead of a "small interrogation room," defendant was questioned in a *large* conference room "about the same size" as the undersigned's courtroom. *Id.* at 13. And instead of being besieged with questions by "multiple agents," only two agents entered the conference room, *id.*, and the majority of the questioning was done by TFO Harley, with Agent Rogalski interjecting a question "at times." *Id.* at 18. Despite defense counsel's representations to the contrary, doc. 29 at 1, these unsworn assertions were *not* supported by the exhibits attached to defendant's motion; hence, counsel failed to comply with the requirements of LCrR 12.1. Presumably, these colorful but *false* embellishments came from a lying client, not from the imaginative mind of defense counsel. Regardless, the Court's time and resources were wasted in addressing factual assertions that defendant declined to swear to either by affidavit or through testimony.

place a phone call to his mother constituted a coercive tactic -- finds no support in the case law. A well-educated adult who has been seized by the police on suspicion of criminal activity simply has no right to call his mother before deciding whether to submit to police questioning.[4] The fact that defendant's mother (or at least one of his parents, tr. 33-34), happens to be a lawyer is of no importance to the voluntariness analysis, for defendant never indicated that he wanted to speak to his mother *as his attorney* or seek her assistance in obtaining counsel, just that he wanted to let her know that he had arrived in Savannah. *Id.* at 32 (the request to call his mother was made when defendant first entered the conference room and before the advice of rights); *id.* at 45 (when defendant initially asked to call his mother he didn't say she was an attorney). When the agents responded that defendant did not need to call his mother "right now," *id.* at 32, they did not engage in any type of intimidation or coercion

---

[4] *See Locust v. Ricci*, 2011 WL 6413858 at *10 (D.N.J. Dec. 12, 2011) (defendant's "requests to call his mother did not constitute an invocation of his right to remain silent or his right to counsel."); *United States v. Amoreno*, 2009 WL 3518155 at *2 (N.D. Ill. Oct. 28, 2009) ("the law does not require that an interrogation cease when an arrestee . . . asks to speak [to his mother or some other] relative or friend."); *see also Fare v. Michael C.*, 442 U.S. 707, 718-24 (1979) (juvenile's request during custodial interrogation to speak with his probation officer who, under California law occupied a position as a trusted guardian in a minor's life, did not constitute an invocation of the right to counsel).

that deprived this educated and competent adult of the ability to make a "free and deliberate choice" about whether to speak with the police. *Connelly*, 479 U.S. at 163.

After defendant was advised of his *Miranda* rights, he mentioned that his mother was an attorney and said he was unsure whether to waive his rights or not. Tr. at 32, 34. But defendant did not ask to call his mother at that point, *id.* at 34, and he never indicated a desire to speak with counsel, be it his mother or anyone else. *Id.* at 46. There is simply no merit to defendant's claim that the agents somehow coerced him to confess by refusing to let him notify his mother that he had arrived in Savannah.[5]

Defendant next contends that the agents improperly induced him to confess by indicating that it would be better for him to speak and provide a "truthful and honest" statement about his criminal activities. *Id.* at

---

[5] Neither in his motion to suppress nor at the evidentiary hearing did defendant claim that he made even an *equivocal*, much less an express, invocation of his right to counsel. And for good reason, for the law is clear that a "suspect must unambiguously request counsel;" law enforcement officers are not required to cease questioning just because a suspect makes an "ambiguous or equivocal reference to an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994); *id.* at 461-62 (declining "to adopt a rule requiring officers to ask clarifying questions" in the face of an ambiguous or equivocal request for counsel).

40-41, 45. The Constitution prohibits the police from extracting a confession from a suspect through any coercive interrogation technique -- be it physical abuse or psychological pressure -- that is sufficient to overbear the suspect's will and critically impair his capacity for self-determination. *Connelly*, 479 U.S. at 163 & n. 1; *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition."). A confession is involuntary, therefore, if made in response to a *false* promise that it will not be used against the suspect, or that he will not be prosecuted or will face a lesser charge and punishment if he cooperates with the police. *United States v. Lall*, 607 F.3d 1277, 1286-87 (11th Cir. 2010) (officer's promise that nothing defendant said would be used against him rendered his confession involuntary and inadmissible in a later federal prosecution); 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.2(c) at 623-25 (3rd ed. 2007) ("courts have often held that a confession is involuntary if made in response to a promise that the result will be non-prosecution, the dropping of some charges, . . . or a certain reduction

11

in the punishment defendant may receive"). Suppression of a confession secured through a false promise of non-prosecution or a firm assurance of leniency is required because

> "the government has made it impossible for the defendant to make a *rational* choice as to whether to confess -- has made it in other words impossible to weigh the pros and cons of confessing and go with the balance as it appears at the time." . . . Thus, "if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out."

*Lall*, 607 F.3d at 1286 (quoting *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990) (Posner, J.)).

The federal courts, however, "have consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession." *United States v. Umana*, 750 F.3d 320, 324 (4th Cir. 2014); *see* 2 LaFave, *Criminal Procedure* § 6.2(c) at 624 n. 101 ("Statements 'suggesting leniency are only objectionable if they establish an express quid pro quo bargain for the confession.'"). Statements which focus on the possible benefits of cooperation, but which fail to explain that a suspect's

cooperation may not always be to his advantage,[6] are "the sort of minor fraud that the cases allow." *Rutledge*, 900 F.2d at 1131. Thus, the voluntariness of a confession is not undermined simply because an officer tells a suspect that "all cooperation is helpful" (even though that "statement was, at least in hindsight, false"), *id.* at 1128; that his statements "would not 'cost' him anything or 'affect' him," when in fact those statements were used against him, *Umana*, 750 F.3d at 344; or "that cooperating defendants generally 'fared better time-wise.'" *United States v. Nash*, 910 F.2d 749, 752-53 (11th Cir. 1990).

The Fourth Circuit has held that "the cryptic promise that 'things would go easier on [the suspect]' if he confessed [did not] amount[] to unconstitutional coercion." *Rose v. Lee*, 252 F.3d 676, 686 (4th Cir. 2001). The agents' assurance in this case that "that things would go better for [defendant] if he spoke," tr. at 40; *id.* at 45, likewise did not

---

[6] The suspect's confession, for example, may provide the key evidence for the crime under investigation that the police were otherwise lacking or, as in *Rutledge*, may reveal other criminality not under investigation that ultimately serves to enhance the suspect's sentence. *Rutledge*, 695 F.3d at 1128 (by cooperating, defendant revealed other related conduct that "'helped' him to a sentence four to six times longer than he would have received had kept mum."). By the time of the interview in this case, the agents already had built a solid case against defendant, and thus the agents may have been entirely correct in suggesting that it would go "better" for defendant if he cooperated.

serve to overbear defendant's will or render it impossible for him to make a rational, informed choice whether to confess. While this advice *may* have been misleading under the particular circumstances of this case (an issue that has yet to be determined), it did not amount "to an outright promise that nothing [defendant] said would ever be used against him," *Umana*, 750 F.3d at 345, but instead, constituted the type of "vague, nondescript encouragement [that] did not misrepresent the legal effect of confessing." *United States v. Whitfield*, 695 F.3d 288, 303 (4th Cir. 2012). Defendant had just been warned, as part of the advice of rights, that anything he said could be used against him. He was not subjected to a prolonged detention or interrogation; nor was he a person unusually susceptible to coercion because of age, lack of education, or intelligence. *United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997).

## III. CONCLUSION

It has repeatedly been held that the police may use such "minor fraud" assurances like "all cooperation is helpful" or "things will go easier if you confess" without undermining voluntariness. The agents' assurance in this case that things would go better for defendant if he

cooperated (even if that ultimately turns out to have been a misleading statement) sits on that minor-fraud continuum. Under the totality of the circumstances, including defendant's individual characteristics and the overall nature of the interrogation, the agents did not deprive defendant of the ability to make a rational choice between exercising or waiving his Fifth Amendment privilege against self-incrimination, either by refusing to allow defendant to let his mother know that he had arrived safely in Savannah or by opining that it would be better for defendant to cooperate. As defendant has failed to identify any will-overbearing coercive activity in this case, his motion to suppress must be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 28th day of January, 2015.

/s/ M. Smith
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA